**Mark S. DeMarco**
Attorney At Law
2027 Williamsbridge Road
Bronx, New York 10461
718 239 7070
Fax 718-239-2141
MSDLaw@aol.com

September 8, 2021

Hon. Vincent L. Briccetti
United States District Judge
Southern District of New York
300 Quarropas Street
White Plains, NY  10601

**BY ECF & ELECTRONIC MAIL**

           Re: *United States v. Javier Da Silva Rojas*
              **20 Cr. 097 (VB)**

Your Honor:

**Introduction**

   **Venezuela & Javier Da Silva's Childhood**

   On January 3, 1995, Javier Da Silva was born in Caracas, Venezuela.[1] He and his younger brother Jose were raised in a close-knit, hard-working-family by their parents, who were both gainfully employed outside the home.  Since Javier was four-years-old, Venezuela has been run by two men. From 1999 to his death in 2013, Hugo Chávez was president. He was succeeded by his right-hand man, Nicolás Maduro.

   During their more than two decades in power, the United Socialist Party of Venezuela (PSUV) which was founded by Chávez gained control of many key institutions including much of the judiciary, the electoral council and the supreme court.  And since 2013, when Javier graduated high school, Venezuela's economy under President Maduro, has collapsed. Shortages of basic supplies became widespread, prompting more than 5.6 million people to leave.  Indeed, it's difficult to overstate how dire Venezuela's economic plight was then and continues today.

   The country entered a deep recession in 2014 spurred by the drop in global oil prices, and

---

[1] Mr. Da Silva was born with spina bifida, had immediate surgery to repair the exposed part of his spinal cord and spent the first six months of his life hospitalized.

Hon. Vincent Briccetti
September 8, 2021

cumbersome regulations on its currency produced record-breaking inflation. The Economist Intelligence Unit estimates Venezuela's economy has contracted by more than 75% since 2014.[2] Seventy-five percent of the country's population lost an average of 19 pounds of body weight between 2015 and 2016 due to food shortages throughout the country.[3]

As a result, Mr. Da Silva's parents' jobs were adversely impacted; crime and violence in his community soared; basic household necessities became scarce, and; his family, like most Venezuelans, struggled to put enough food on the table.  The Da Silva family often relied on bread, pancakes and potatoes to survive.  Although Javier participated in peaceful protests to bring attention to the corrupt and unjust government, he stopped when it became too dangerous to continue.  Maduro cracked down on street protests with lethal force, with government security forces killing demonstrators.  During several crackdowns since 2014, Venezuelan security forces and *colectivos*[4] have attacked demonstrations. Security forces have shot demonstrators at point-blank range with riot-control munitions, brutally beaten people who offered no resistance, and staged violent raids on apartment buildings.

Between 2016 and 2019, Venezuelan police and security forces killed more than 19,000 people, alleging "resistance to authority."  Agents of FAES, a special police force, and others have killed and tortured with impunity in low-income communities, instilling fear and maintaining social control. Security force raids on low-income communities from 2015 through 2017, called Operations to Liberate the People, have resulted in widespread allegations of extrajudicial killings, mass arbitrary detentions, mistreatment of detainees, and forced evictions.[5]

---

[2] Congressional Research Service: Venezuela: Political Crisis and U.S. Policy, March 10,2021, https://sgp.fas.org/crs/row/IF10230.pdf.

[3] www.independent.co.uk/news/world/americas/venezuela-weight-loss-average-19lb-pounds-food-shortages-economic-crisis-a7595081.html

[4] Colectivos are irregular, leftist Venezuelan community organizations that support Nicolás Maduro and the United Socialist Party of Venezuela. Colectivo has become an umbrella term for armed paramilitary groups that operate in poverty-stricken areas and attack individuals,] engaging in "extortion, kidnaping, drug trafficking and murder".  They are associated with extrajudicial killings and terrorizing those who disagree with them.

[5] World Report 2021: Venezuela | Human Rights Watch, https://www.hrw.org/world-report/2021/country-chapters/venezuela#

Hon. Vincent Briccetti
September 8, 2021

### Javier Flees Venezuela Alone & Emigrates to the United States

Not surprisingly, like more than 5 million other Venezuelans, Javier left the country in 2017 to escape the violence, insecurity and threats, as well as the lack of food, medicine and essential services. He came to the United States alone with $600 in his pocket, seeking food, work, a better life and the opportunity to earn and save enough money for his family to also flee Venezuela. In order to pay for his plane ticket to the United States, his father sold the family television and Javier borrowed the balance from his aunt.

Upon his arrival in the United States, he was sporadically employed until 2018, when he found work as a cashier and short order cook in a New York City restaurant where he was employed until his arrest here. Indeed, his dreams to secure a better life for himself and his family were short-lived, when, on January 28, 2019, he committed the tragic crimes charged here.

Javier Da Silva is an intelligent, kind and remorseful young man, who is guilty of an incredibly serious crime: the kidnaping and murder of Valerie Reyes on January 28, 2019. As described below, Mr. Da Silva is a caring, generous and hardworking individual, a young man who has always placed his family, friends and community before himself. He is a devoted son and brother and he has been an immense strength for his family throughout difficult times; has served as a role model to many; has been a respected and selfless friend, and; a dedicated and tireless animal advocate.

Indeed, we have attached numerous character letters and photographs in support of this submission, all reflecting the significant and meaningful role that Javier has played in the lives of family, friends and business acquaintances. These letters, discussed more fully below, evidence strongly the high regard that he is held in his community, his unflinching response to help anyone in need, and his critical importance to his family. It would be virtually impossible to include a letter from every individual Mr. Da Silva has positively influenced, and equally daunting to comment on every letter received. Still, the myriad letters on which we do remark and attach hereto paint a consistent picture of a respected, generous, caring and selfless person. The letters also speak of a softhearted, well-intentioned person, who is remorseful for his actions. Sadly, were it not for this sentencing, many of Mr. Da Silva's exceptionally good qualities and deeds probably would have gone unrecognized.

Javier Da Silva is a 26 year old man with absolutely no prior criminal history, who on February 5, 2020, appeared before this Court and pleaded guilty to Count One of the Indictment which charged him with kidnaping Valerie Reyes in violation of *18 U.S.C. § 1201(a)(1)*. He has endured a difficult childhood in Venezuela and he now faces an incredibly lengthy sentence away from his family. Mr. Da Silva's childhood and his experiences in Venezuela and the United States have, in this writer's opinion, contributed significantly to his current situation.

Hon. Vincent Briccetti
September 8, 2021

    At the outset, it must be noted that neither Mr. Da Silva nor his attorneys are attempting to minimize the seriousness of his crimes. He understands the significant effect his conduct has and continues to have on Ms. Reyes's family and acknowledges that this Court must sentence him to a substantial term of imprisonment. Nevertheless, this memorandum is submitted to paint a picture of the young, remorseful man that this Court will be sentencing on September 23, 2021.

### *18 U.S.C. § 3553(a)* Factors

    Pursuant to the Supreme Court's decision in *United States v. Booker*, the Guidelines are advisory; a sentencing court may depart in the interest of justice as well as in light of other statutory concerns as expressed in section 3553(a). *United States v. Booker*, 543 U.S. 220, 245-46, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005); see also *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) ("It is now, however, emphatically clear that the Guidelines are guidelines — that is, they are truly advisory. A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense.").

    A sentencing court shall "state in open court the reasons for its imposition of the particular sentence." 18 U.S.C. § 3553(c). If the sentence is not of the kind prescribed by, or is outside the range of, the Sentencing Guidelines referred to in section 3553(a)(4) of title 18, the court shall indicate the specific reasons for imposing a different sentence. See 18 U.S.C. § 3553(c)(2). These "reasons must also be stated with specificity in a statement of reasons form." Id. Even though the Guidelines are now advisory rather than mandatory,[*Booker*, 543 U.S. at 245-46], the sentencing court must still adhere to the requirements of 18 U.S.C. § 3553(c)(2). *United States v. Jones*, 460 F.3d 191, 197 (2d Cir. 2006). The sentencing court's written statement of reasons shall be "a simple, fact-specific statement explaining why the Guidelines range did not account for a specific factor or factors under § 3553(a)." *United States v. Rattoballi*, 452 F.3d 127, 138 (2d Cir. 2006), abrogated in part on other grounds by *Kimbrough v. United States*, 552 U.S. 85, 128 S. Ct. 558, 169 L. Ed. 2d 481 (2007). The statement should demonstrate that the court "'considered the parties' arguments' and that it has a `reasoned basis for exercising [its] own legal decision making authority.'" *Cavera*, 550 F.3d at 193 (quoting *Rita v. United States*, 551 U.S. 338, 356, 127 S. Ct. 2456, 168 L. Ed. 2d 203 (2007)).

    In view of the excessive incarceration rates in the recent past and their unnecessary, deleterious effects on individuals sentenced, society, and our economy, parsimony in incarceration is prized. See, e.g., 18 U.S.C. § 3553(a) ("The court shall impose a sentence sufficient, but not greater than necessary."); National Research Council of the National Academies, The Growth of Incarceration in the United States, Exploring Causes and Consequences, 8 (2014) ("Parsimony: the period of confinement should be sufficient but not greater than necessary to achieve the goals of sentencing policy.").

    Accordingly, under normal circumstances, a court "shall impose a sentence sufficient, but

Hon. Vincent Briccetti
September 8, 2021

not greater than necessary, to comply with the purposes" of the Guidelines. *18 U.S.C. § 3553(a)*. The Guidelines range is the "starting point and the initial benchmark." *United States v. Johnson, 567 F.3d 40, 51 (2d Cir. 2009) (quoting Gall v. United States, 552 U.S. 38 (2007))*. "A district court is authorized to depart from a Guidelines range if the court finds that 'there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" *United States v. Juvenile Male Po, 466 Fed. Appx. 14, 15 (2d Cir. 2012) (summary order) (citing 18 U.S.C. § 3553(b))*.

**The Sentencing Factors As Applied to Javier Da Silva**

*18 U.S.C. § 3553(a),* and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), outline the task facing district courts in considering the guidelines.  The court must determine the applicable guidelines range, and further consider applicable policy statements.  After thus considering the guidelines, the Court must consider all the other factors set forth in *§ 3553(a)* before determining whether (i) to impose the sentence that would have been imposed under the guidelines, i.e. a sentence within the applicable guideline range or within permissible departure authority, or (ii) to impose a non-guideline sentence.

The information contained herein is not meant to denigrate the seriousness of the crimes, nor the losses likely felt by the relatives of the victims.  It is well-established that mitigation evidence is not permitted as an excuse or justification for engaging in criminal conduct, but rather as mitigation in the length of sentence or punishment to be imposed as a result of that criminal conduct. See, *Lockett v. Ohio*, 438 U. S. 586 (1978), *Abdul Kabir v. Quarterman*, 550 U.S. 233, 246 (2007).

**Personal Characteristics**

**Mr.  Da Silva's  Childhood**

As previously stated, Javier Da Silva was born in Venezuela in 1995 and was raised in a middle-class, peaceful environment by his father Enrique Da Silva, who drove a truck and managed a service station, and his mother Carmen Rojas, who supplemented the family income as a hairstylist.  Javier remembers being raised in a stable and secure environment, with no food shortage and the opportunity to attend and focus on school.  After graduating from high school in 2013, he attended college until the "deteriorating political situation in his country" and his inability to pay tuition forced him to abandon his education. *See PSR ¶ 72.*  In 2017, at the age of 22, he fled the economic and political turmoil in Venezuela, leaving his entire family behind, with the hopes of securing employment and saving enough money to reunite with his parents and brother in the future.  He arrived in New York on or about May 8, 2017.

### Educational & Vocational History

After graduating high school, Mr. Da Silva attended three universities: in 2014, he attended the Universidad Bicentenaria de Aragua, located in Turmero, Venezuela, where he studied law; in 2016, he completed two semesters at the Universidad Catolica Santa Rosa in Caracas, where he studied journalism, and; he attended Film and Television School (ESCINETV Escuela de Cine y Television) in Caracas. However, he was forced to abandon his studies due to the political and economic instability in Venezuela.

Since arriving in the United States, he has worked for several cleaning companies, doing disaster cleanup work and, from 2018 until his arrest, he was employed as a cashier and cook for a restaurant in New York City.

### Substance Abuse

Mr. Da Silva began smoking marijuana when he graduated high school. He smoked periodically until he arrived in the United States, when it increased to several times per week.

Notably, in September 2018, months before the charged conduct, Mr. Da Silva started using synthetic cannabinoids[6], commonly known as "oil, vape and moon rocks" and, by the end of 2018, he was using these substances daily, often mixing them with marijuana.

### Mr. Da Silva's Post-Arrest Conduct & Conditions of Confinement

Since his incarceration, Mr. Da Silva has been a model inmate. It is also important to note that since March 2020, because of the Covid-19 pandemic, he has been incarcerated under conditions which are unsafe. He has endured continuous lock downs and has been unable to have social visits. The Covid protocols – continuous lock downs, lack of programming and no social visits – continues today. There is currently little-to-no recreation or programming available to inmates and there remains the fear of contracting COVID-19 inside of the jail.

The most difficult aspect of the quarantine for most inmates has been the isolation. While in-person legal visits were sporadic, inmates received no social visits and limited phone calls. Historically harsh conditions of confinement like these have played a role in the Court's

---

[6] Synthetic cannabinoids (SCBs) are chemicals that produce several marijuana-like effects in humans. Psychotic-like symptoms can arise during acute SC intoxication, with paranoia, disorganized behavior, visual and auditory hallucinations, and suicidal thoughts typically lasting significantly longer than motor symptoms or anxiety. See Liana Fattore, Synthetic Cannabinoids – Further Evidence Supporting the Relationship Between Cannabinoids and Psychosis, https://pubmed.ncbi.nlm.nih.gov/26970364/

Hon. Vincent Briccetti
September 8, 2021

determination of an appropriate sentence and, since the situation with the BOP is unlikely to improve in the near future, it is important for this Court to be apprised of these conditions when sentencing Mr. Da Silva. Cleanliness and social distancing will remain impossible within jails and prisons. And, unfortunately, quarantines and lock downs are likely to remain a central tool in Bureau of Prisons efforts to curb the advance of the disease.

Unlike prisoners in the past who anticipated family visits, phone calls and an ability to engage in meaningful educational programing, future incarceration for Mr. Da Silva will likely involve extended periods of isolation, lack of access to family and little opportunity for educational advancement.

### **Javier Da Silva is a Devoted Son, Grandson & Relative**

As set forth in the attached letters and photographs [**See Defendant's Exhibits A, B & C, Letters from Family, Letters from Friends & Photographs, respectively**], Mr. Da Silva's family members extol him as an decent, generous, kind, sincere, devoted and intelligent young man. His mother Carmen Da Silva writes:

> Javier never had problems, neither at school nor at university, he never had enmity with anyone nor is he aggressive, on the contrary he is very calm he had in mind to progress and help the family.
>
> Javier Enrique had to leave the University to travel to the United States, due to the situation in the country, his aunt Josefina Da Silva helped him with the tickets, he went to look for a better future. To help the grandparents with the medicine for his grandmother who suffers from Parkinson's, because the situation in Venezuela is very bad.
>
> Javi left with great emotion and at the same time great sadness for leaving his family. And that's how Javier was when he started working, he helped many people in Venezuela, he stopped buying clothes, to send money to Venezuela that made him very happy.

[*Ltr. of Mrs. Da Silva*].

Similarly, his aunt Yoraima de Jesus Dugarte Rojas describes Mr. Da Silva as "very respectful" and "kind child and young man." She recalls difficult time in her life when Javier "accompanied [her]," making her feel "protected and safe with his presence." [*Ltr of Yoraima de Jesus Dugarte Rojas*].

Mr. Da Silva's aunt Yosmar Dugarte Rojas describes him as an intelligent, affectionate and generous person, who left Venezuela in search of a better future. She describes him as a

Hon. Vincent Briccetti
September 8, 2021

young man who divided his earnings to send economic help to her and to his family in Venezuela. [*Ltr of Yosmar Dugarte Rojas*].

Further, the letters from Mr. Da Silva's family describe him as a caring, loving, generous, nurturing and dedicated family man. The following instances validate this well-earned reputation:

His cousin Darianna Da Silva recalled a time when Javier saved her from drowning; how he adopted and cared for an "abandoned, elderly and sick dog" and; how he cared for his grandmother who was suffering from Parkinson's disease. [*Ltr of Darianna Da Silva*].

Dairon Da Silva writes how Javier supported him when he was "heartbroken for the first time;" how he came to the United States to help pay for his grandmother's Parkinson's medication, and; how he adopted and cared for a sick dog while living in New York. [*Ltr of Dairon Da Silva*].

The balance of the letters from Mr. Da Silva's family describe him as a "sincere, generous and supportive person" [*Ltr. of Rosalba Rojas*]; "quiet, kind, loving, with great artistic skills and intelligent person" [*Ltr of Yamili Pinto Rojas*], and; as a "dreamer, generous, hardworking, good to other people, honest, he has always shown immense love for his parents and his brother" [*Ltr of Gladimar de Jesus Nava Rojas*].

### **Javier Da Silva is a Polite, Helpful, Selfless and Loyal Young Man & Friend**

Mr. Da Silva's friends and acquaintances paint a similar picture of him. **See Defendant's Exhibit B**. They too extol him as a charitable, selfless, generous and loyal friend. They also describe Mr. Da Silva as extremely earnest and polite.

The following examples corroborate Mr. Da Silva's well-deserved reputation:

To begin, Gerardo Lanza, who has known Javier since he was a child, remembers him as a "very respectful child with a desire to learn." He writes how Javier "has always behaved like a generous, honest, polite, helpful young man toward others." [*Ltr of Gerardo Lanza*].

Daniel Amaral, who has known Mr. Da Silva since high school, writes about his generosity and kindness:

> When I needed a friend, Javier offered me his friendship, and remembering the best and most important moments of my life . . . Javier was always there for me.

*Ltr of Daniel Amaral*.

Hon. Vincent Briccetti
September 8, 2021

Finally, Mr. Asterio Rangel, who was the handyman in the Flushing apartment building where Mr. Da Silva resided, describes him as a "very polite gentleman [who was] very respectful with his neighbors and [ ] a great roommate to the friends he lived with." [*Ltr of Asterio Rangel*].

**Javier Da Silva Deeply Regrets His Actions**

It must be noted and this Court should be aware that Mr. Da Silva has expressed true, heartfelt remorse for the crime that he has committed and, from our very first meeting at the Westchester County Correctional Facility, he has acknowledged responsibility for his participation in these crimes and, from the earliest stages of the case, defense counsel engaged in plea negotiations with the Government, resulting in a plea agreement which, with little hesitation, he accepted and entered a timely plea of guilty. In fact, the greatest remorse he feels is for the pain and suffering caused to Ms. Reyes and her family.

Mr. Da Silva, who is an intelligent, generous and soft-spoken man, has accepted responsibility and is incredibly remorseful for the crime that he has committed.

**Conclusion**

Since Mr. Da Silva has agreed not to request a sentence of less than 30 years imprisonment, his childhood and personal history discussed above has little relevance to the sentence that this Court will impose. However, it is relevant as a measurement of Mr. Da Silva's potential for resiliency and rehabilitation, and predictive of his future. This information is not offered as an excuse for criminal conduct, but to assist the Court in its determination of the appropriate sentence to be imposed in his case.

Finally, Mr. Da Silva respectfully requests that this Court recommend, pursuant to *18 U.S.C. § 3582(a)*, that the United States Bureau of Prisons designate him to a facility in the Northeast Region of the United States to facilitate family visits.

Thank you for your attention to this matter.

Respectfully submitted,

*Mark S. DeMarco*

Mark S. DeMarco
Jason Ser
Attorneys for Javier Da Silva

cc:   Samuel Adelsberg, Esq.
      Mathew Andrews, Esq.
      Assistant United States Attorneys