

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

United States District Courthouse
300 Quarropas Street
White Plains, New York 10601

September 16, 2021

**BY ECF & HAND**

The Honorable Vincent L. Briccetti
United States District Judge
Southern District of New York
The Hon. Charles L. Brieant Jr. United States Courthouse
300 Quarropas Street
White Plains, New York 10601-4150

Re:  *United States v. Javier Enrique DA SILVA Rojas,* **20-cr-97 (VB)**

Dear Judge Briccetti:

The Government respectfully submits this letter in advance of sentencing in this matter, currently scheduled for September 23, 2021 at 10:00 a.m.  For the reasons explained below, the Government submits that a sentence of 360 months' imprisonment would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

**A.  Factual Background**

The relevant offense conduct and victim information is set forth in detail in the Pre-Sentence Report ("PSR"); the defendant's plea allocution (a transcript of which is incorporated herein as <u>Exhibit A</u>) (the "Allocution"); and the victim impact statements from friends and family members of Valerie Reyes ("Reyes").

As set forth in greater detail below, Reyes was a 24-year old resident of New Rochelle, New York.  She was the oldest of four children and shared a close relationship with her family members, in particular to her mother, Naomi Sanchez.  On January 28, 2019, Javier DA SILVA ("DA SILVA" or the "defendant"), who previously was in a romantic relationship with Reyes, rented a car from a garage in Flushing, New York and drove to Reyes' residence in New Rochelle.  After entering Reyes' residence, the defendant viciously struggled with her, bound her feet and hands while she was still alive, placed tape over her mouth, put her in a suitcase in which she eventually suffocated to death, and transported her to Greenwich, Connecticut, where he disposed of her body.  Reyes' body remained there for almost two weeks—trapped in a red suitcase that had become her coffin.  And while her friends and family desperately sought to find her, the defendant enriched himself by draining Reyes' bank accounts, using her debit card,  and selling her valuables for electronics, including a television and laptop.

1. **The Offense Conduct**

   a. **The Defendant's Prior Relationship with Reyes**

DA SILVA and Reyes met on a dating website in January 2018. They dated until approximately April 2018. PSR ¶ 10. According to Reyes' friends and family, their time together was tumultuous because DA SILVA wanted a more serious relationship, but Reyes did not. *Id.* at ¶ 11. DA SILVA and Reyes briefly discussed living together, but after Reyes indicated that she needed a hiatus, the couple terminated their relationship in April 2018. *Id.* DA SILVA attempted to contact Reyes after the breakup (including sending her a birthday message and songs), but she stopped responding to him. DA SILVA was apparently "destroyed" for a few months after their separation. *Id.*

DA SILVA and Reyes were not in regular contact after their breakup. *Id.* at ¶ 12. The last known communication between them was on September 13, 2018. *Id.* On that date, Reyes texted a friend, and told him that DA SILVA reached out to tell her that he mistakenly used her debit card information and wanted to reimburse her. *Id.* During this exchange, Reyes texted her friend, "I don't wanna talk to him at all or have anything to do with him" and asked the friend if she could use his account to accept the reimbursement. *Id.*

On January 24, 2019—approximately a week and a half before Reyes went missing—DA SILVA sent a text messages to a woman with whom DA SILVA appeared to be romantic. *Id.* at ¶ 13. DA SILVA stated, "I just found my ex fucking in my bed with the guy next door in new rochelle on December after year's . . But i didn't wanted to tell you shit." Reyes lived in New Rochelle.

   b. **The Kidnapping**

On the afternoon of January 28, 2019, Reyes left her job at Barnes and Nobles in Scarsdale, New York. *Id.* at ¶ 14. That evening, she spoke to her mother, and told her that she was nervous, anxious, and afraid someone was going to murder her. *Id.* She did not specify regarding whom she was afraid. Reyes also exchanged several text messages with a friend that evening. *Id.* At approximately 11:35 p.m., Reyes texted the friend "ima knock out now my eyes can't open anymore lol." *Id.*

At approximately 10:50 p.m., surveillance footage from DA SILVA's apartment complex shows him leaving his apartment in Queens, New York, and five minutes later, at 10:55 p.m., a surveillance recording shows DA SILVA retrieving a rental car from a garage near his home. *Id.* at ¶ 15. Thereafter, DA SILVA input an address for a New Rochelle church into the Google Maps application on his phone. *Id.* The church is approximately one mile from Reyes' residence. *Id.* Google location data showed that DA SILVA then drove to New Rochelle. Minutes after midnight on January 29, 2019, the location data from DA SILVA's phone reflected that he was within 200 feet of Reyes' home. *Id.* At this time, he turned off the location data on his cellular phone. *Id.* Cell site data for DA SILVA's phone further indicated that he placed his phone on "airplane" mode at this time. *Id.* There is no record of communication between DA SILVA and Reyes prior to or after his arrival in New Rochelle. *Id.*

Sometime after DA SILVA entered Reyes's apartment, DA SILVA and Reyes had a violent altercation, during which Reyes suffered head trauma, bruising around the face, and a large hematoma to her forehead. *Id.* at ¶¶ 16, 24. Afterwards, DA SILVA bound and gagged Reyes, placed tape around her mouth, and eventually placed her body inside a suitcase. *Id.* at ¶ 16. Reyes was still alive when she was bound and gagged. Ex. A at 27. DA SILVA removed Reyes from her apartment in the suitcase and placed her in his rental vehicle. *Id.*

At approximately 3:00 a.m. (three hours after DA SILVA turned his location data off), Reyes's phone stopped pinging cell towers, indicating that the phone had been placed into airplane mode. *Id.* at ¶17. Around the same time, DA SILVA accessed Reyes' iCloud account from Reyes' phone. *Id.* DA SILVA viewed her notes, photo library, browsing history, and the Find My iPhone application until approximately 4:17 a.m. *Id.* Then, at 4:20 a.m. and again at 4:33 a.m., DA SILVA accessed Reyes's Chase Bank application on her phone, using her thumbprint, and checked her account balance.

Approximately half an hour later, DA SILVA used an ATM at a Chase Bank in New Rochelle to withdraw $1,000 from Reyes's account. *Id.* at ¶ 18. Surveillance footage from the bank showed DA SILVA making the withdrawal. After obtaining the money, DA SILVA exited the bank, went to his rental car, and drove westbound.

At approximately 6:29 a.m., DA SILVA's phone began pinging cell phone towers in Harrison, New York. *Id.* at ¶ 19. DA SILVA's phone continued pinging cell towers in the vicinity of Darien, Connecticut, between 6:53 a.m. and 7:11 a.m. At approximately 7:11 a.m., DA SILVA logged into several applications on Reyes's phone. Thereafter, DA SILVA's phone pinged a cell tower in Greenwich, Connecticut, at 7:24 a.m., a cell tower near Scarsdale at 8:06 a.m., a cell tower in New Rochelle at 8:27 a.m., and a cell tower in Queens County at 9:11 a.m. As reflected in his phone pings, DA SILVA drove through southern Connecticut before pulling his vehicle to the side of the road in Greenwich, removing the suitcase with Reyes inside, and dumping it in the woods several yards from the road. *Id.*

DA SILVA turned on his phone's Google location services upon his arrival in Queens County. *Id.* Surveillance footage from DA SILVA's apartment complex showed that he arrived back home at approximately 9:43 a.m. *Id.* at ¶ 20. At this juncture, DA SILVA was wearing a different outfit than when he initially left his residence the evening before and carrying a duffel bag. *Id.* DA SILVA exited the apartment complex without the duffel bag several minutes later. *Id.*

### c.  The Aftermath of Reyes' Murder

On January 30, 2019, Reyes was reported missing by her family. *Id.* at ¶ 21. That same day, DA SILVA used Reyes's debit card at an ATM in Midtown Manhattan to withdraw approximately $1,000. *Id.* at ¶ 22. DA SILVA made additional withdrawals using Reyes's debit card in Manhattan on January 31, 2019, February 1, 2019, and February 2, 2019. *Id.* In total, DA SILVA withdrew approximately $5,350 from the account between January 29, 2019 and February 2, 2019. *Id.*

On the morning of February 5, 2019, public works personnel located a red suitcase near a public road in Greenwich. *Id.* at ¶ 23. When she was recovered, Reyes's body was barefoot and wearing an unbuttoned shirt and denim jeans. *Id.* Her feet, knees, and hands were bound with white twine and packing tape. *Id.* Her hands were bound behind her back, and there were multiple layers of packing tape over her mouth and chin. *Id.* There were also obvious signs of head trauma, including bruising around the face and a large hematoma on her forehead. *Id.* Traces of DA SILVA's DNA was located on a genital swab and on a breast swab from Reyes. *Id.* at ¶ 34. DA SILVA's DNA also appeared in Reyes's fingernail clippings and on the handle of the suitcase in which Reyes was found. *Id.*

On February 5, 2019, the New Rochelle Police Department searched Reyes's apartment. *Id.* at ¶ 26. There was no overt indication of a struggle in the apartment. *Id.* A forensic analysis showed a small blood stain on Reyes's bedroom pillow, two small blood stains on the floor of the bathroom, and another small blood stain on the bathroom toilet. *Id.*

Approximately 16 hours after Reyes's body was recovered, in the early morning of February 6, 2019, DA SILVA again rented the same vehicle that he used to travel to New Rochelle the night of the murder. *Id.* at ¶ 27. Google location data from DA SILVA's phone showed a cluster of Wi-Fi hits in the vicinity of a car wash in Bronx, New York, suggesting that DA SILVA rented the vehicle to clean it. *Id.* DA SILVA then returned the car to the rental car garage. *Id.*

On February 7, 2019, DA SILVA used an online marketplace to trade Reyes's iPad for an Apple monitor and laptop. *Id.* at ¶ 28. On February 8, 2019, DA SILVA took a photograph, depicted below, of himself and his newly acquired monitor and laptop. *Id.* DA SILVA reported to his roommate that he had "found" the items. *Id.*



On February 11, 2019, officers from the Greenwich Police Department and the New Rochelle Police Department arrested DA SILVA for larceny based on his use of Reyes' debit card. *Id.* at ¶ 29.  As described further below, he was interviewed on February 12, 2019.  *Id.*   On the same day, law enforcement searched DA SILVA's residence in Queens County, pursuant to a search warrant. They found Reyes's driver's license and debit card inside DA SILVA's wallet.

### d.  DA SILVA'S False Statements to Law Enforcement

DA SILVA made several false statements during his February 12, 2021 interview with law enforcement.  *Id.* at ¶ 30.  DA SILVA first explained that he found Reyes's debit card on the sidewalk while he was bar hopping in the East Village of Manhattan.  *Id.*   DA SILVA further stated that there was a piece of paper inside of the wallet that contained the card's personal identification number, which is how he was able to withdraw money using the card.  *Id.*   DA SILVA also noted that he had not been to New Rochelle or Connecticut since the prior year nor had he seen Reyes since the beginning of 2018.  *Id.*

Eventually, DA SILVA admitted that he drove a rental car to New Rochelle on January 28, 2019, but told the interviewing officers that he blacked out from alcohol consumption and could not remember any other details.  *Id.* at ¶ 31.  After further questioning and after being shown a picture of Reyes's deceased body, DA SILVA claimed that Reyes' death was an accident that occurred while the two were having intercourse.  *Id.*   DA SILVA said that he tied Reyes with string and tape found at her apartment to make her fit inside the bag.  *Id.*   He also said that he taped Reyes's mouth so she would not be able to scream.  *Id.*   DA SILVA explained that he brought

Reyes out to the rental car in a suitcase, which he found outside in the garbage, and began driving. *Id.*

DA SILVA further stated that he drove for a while on a highway before he dropped the suitcase with Reyes' body on the side of a road. *Id.* at ¶ 32. Afterwards, DA SILVA drove back to Queens and threw Reyes's phone off the Whitestone Bridge. *Id.* DA SILVA noted that he kept Reyes's Kindle and a pillow and brought them back to his home. *Id.*

### e. The Autopsy Report

On May 2, 2019, the Office of the Chief Medical Examiner for Connecticut prepared an autopsy report that determined that Reyes died as a result of homicidal asphyxia, not from a bruise, an abrasion, or a contusion. PSR ¶ 35. The autopsy described the manner of death as "Homicide (assaulted by other)[.]" *Id.*

## B. Procedural Background

On February 12, 2019, DA SILVA was charged by Complaint with kidnapping resulting in death, in violation of 18 U.S.C. § 1201. On February 5, 2020, the defendant pled guilty, pursuant to a plea agreement with the Government, to an Information charging the defendant with the same offense. PSR ¶ 3. During his plea allocution, DA SILVA stated the following:

> From on or about January 28, 2019, to on or about January 29, 2019, in New Rochelle, New York -- in New Rochelle, New York, after a violent struggle in her apartment while Valerie Reyes was still alive, I bound her feet and hands, placed tape over her mouth, put her in a suitcase, and transported her to Greenwich, Connecticut where I disposed of her body. My above actions, which I knew to be illegal, resulted in the death of Ms. Reyes.

Ex. A. at 27-28. In the plea agreement, the parties stipulated to a Guidelines Range of 360 months' to life imprisonment (the "Stipulated Guidelines Range") and agreed that the defendant will not seek a sentence, or suggest in any way that the Probation Office or the Court consider a sentence, of less than 360 months' imprisonment; and that the Government will not seek a sentence, or suggest in any way that the Probation Office or the Court consider a sentence, of more than 360 months' imprisonment. *Id.*

The Probation Office agreed with the Guidelines calculation set forth in the plea agreement, PSR ¶ 82, and recommended a Guidelines sentence of 360 months' imprisonment. PSR at 17. For the reasons discuss below, the Government agrees with Probation and the defense that a sentence of 360 months' imprisonment would be appropriate in this case.

## C. Victim Impact

Three individuals who knew Reyes have provided victim impact statements, which are attached as Exhibit B. Naomi De Jesus, a friend of Reyes, remembers Reyes as being "one of the most selfless [peoples she has] ever known" and someone who was "always there for her friends

whenever we needed her." She also notes with "sadness" that Reyes' murder deprived Reyes of the chance to meet De Jesus' child, with whom she was pregnant at the time of her letter. Reyes' friend and co-worker, Leslie Martinez, wrote that "Valerie had so much more life to live. She had dreams and goals of one day opening her own tattoo shop. She was so talented and loved art. She was a beautiful soul that was taken too soon." Martinez also noted that "words cannot express the pain and heartache our family, friends and co-workers are experiencing and will continue to experience" as a result of Reyes' death. Victoria Summa, a friend of Reyes, remembers Reyes as a "ray of light" and someone who was "always so passionate about working, speaking about all that she wanted to do in life and she always had amazing love for her family and close friends." Summa lamented that "[n]ot only has [the defendant] taken away an innocent life he has killed a bit of everyone soul who holds Valerie so dear to their hearts."

The Government further notes that Reyes' mother, Norma Sanchez, intends to be present at DA SILVA's sentencing and would like to be heard during the proceeding.

## D. Discussion

### 1.    Applicable Law

As the Court is well aware, the Guidelines still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall* v. *United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49. After that calculation, however, the Court must consider not only the Guidelines, but also the six other factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing (as set forth below); (3) "the kinds of sentences available"; (4) any relevant policy statement by the Sentencing Commission; (5) "the need to avoid unwarranted sentence disparities among defendants"; and (6) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *Gall*, 552 U.S. at 50 & n.6. In determining the appropriate sentence, the Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

| | | |
|---|---|---|
| (A) | to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; | |
| (B) | to afford adequate deterrence to criminal conduct; | |
| (C) | to protect the public from further crimes of the defendant; and | |
| (D) | to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. | |

18 U.S.C. § 3553(a)(2).

### 2.   A Sentence of 360 Months' Imprisonment Is Appropriate in this Case

For the reasons set forth below, the Government submits that a sentence of 360 months' imprisonment would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.[1]

*First*, a sentence of 360 months' imprisonment is necessary to reflect the seriousness of the offense.  DA SILVA kidnapped and murdered an innocent young woman with her entire life ahead of her.  And he did so in an incredibly cruel fashion, forcing Reyes to take her last breaths while hogtied inside of a suitcase that he then dumped in the woods off the side of the road.  DA SILVA then emptied Reyes' bank account, sold her electronics, and went about living his life as if nothing happened—even as Reyes' family and law enforcement desperately searched for any clues of her whereabouts.  The brutal callousness of DA SILVA's offense cannot be understated and merits a lengthy 360 month term of imprisonment.

*Second,* a sentence of 360 months' imprisonment is needed to promote respect for the law. In anticipation of committing his brutal crime, DA SILVA sought to evade law enforcement by shutting off location services on his phone before he arrived at Reyes' apartment.  DA SILVA then sought to cover his tracks by cleaning up the crime scene, hiding the red suitcase with Reyes' body in a forest off the side of the road, throwing Reyes' phone off the Whitestone Bridge, and re-renting the same car to clean it out.  DA SILVA then proceeded to lie to law enforcement several times, obfuscating his role in murdering Reyes.

*Third*, a sentence of 360 months' incarceration is necessary to deter the defendant and others who may be contemplating acts of senseless violence.  Indeed, DA SILVA showed no remorse in the aftermath of Reyes' death by doing everything in his power to prevent his apprehension by law enforcement.  DA SILVA even committed additional financial crimes further showing his lack of remorse.  A substantial sentence of 360 months' imprisonment would serve to not only deter him from committing future crimes but send a clear message to others that violence—and in particular violence against women—is not tolerated in our society.

---

[1] The Government is also seeking restitution for Reyes' electronics (her iPhone, iPad, and Kindle) and the amount of money the defendant stole from her bank account. The Government will provide a restitution amount at sentencing.

**E.  Conclusion**

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence of 360 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By: _/s/_____
Sam  Adelsberg  /  Mathew  S.  Andrews  /
Andrew Dember
Assistant United States Attorneys
(212) 637-2494 / 6526 / 2563

cc:    Mark DeMarco, Esq. (via ECF)
       Jason Ser, Esq. (via ECF)

# EXHIBIT A

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2
    ------------------------------------x
 3  UNITED STATES OF AMERICA,

 4
                                    Case No. 20-cr-0097
 5       -vs-

 6  JAVIER E. ROJAS DA SILVA,

 7                          Defendant.

 8  ------------------------------------x

 9                                  United States Courthouse
                                    White Plains, New York
10                                  February 5, 2020
                                    12:46 p.m.
11

12  Before:
                HONORABLE VINCENT L. BRICCETTI
13
                                    District Judge
14

15  APPEARANCES

16  GEOFFREY S. BERMAN
         United States Attorney for the
17       Southern District of New York
    BY:  MATHEW ANDREWS
18       Assistant United States Attorney

19  LAW OFFICES OF MARK S. DeMARCO
    BY:  MARK S. DeMARCO
20  and
    FEDERAL DEFENDERS OF NEW YORK, INC.
21  BY:  JASON I. SER
    Attorneys for the Defendant
22
    ALSO PRESENT:
23
    PETER ANDERSON, Court Interpreter (Spanish)
24

25
```

1              THE DEPUTY CLERK:  United States of America against

2   Javier Rojas Da Silva.

3              Will counsel please note their appearance for the

4   record?

5              MR. ANDREWS:  Good afternoon, Your Honor.  Mathew

6   Andrews for the government.

7              MR. SER:  Good afternoon, Your Honor.  Jason Ser,

8   Federal Defenders for Mr. Da Silva, who is present in custody

9   and being assisted by the Spanish interpreter.

10             MR. DeMARCO:  Your Honor, Mark DeMarco for Mr. Da

11  Silva as well.

12             THE COURT:  Okay.  Welcome, everybody.  Have a seat.

13             Mr. Da Silva, first of all, are you able to understand

14  the interpreter?

15             THE DEFENDANT:  (In English) Yes, Your Honor.

16             (Through interpreter) Yes, Your Honor.

17             THE COURT:  Do you speak English?

18             MR. SER:  He speaks some English, Your Honor, but he

19  is not a hundred percent fluent, so we prefer to do everything

20  through the interpreter to ensure he understands what's going

21  on.

22             THE COURT:  Okay.  Fair enough.  I will do it that

23  way.  All right.  Have a seat.

24             So since you are here, I am guessing that this matter

25  was wheeled out to me today in front of the magistrate judge,

1   and that the defendant has waived Indictment and entered a pro

2   forma -- well, entered a plea of not guilty to an Information.

3   Is that correct, Mr. Ser?

4          MR. SER:  Yes, Your Honor.

5          THE COURT:  Does your client have an application?

6          MR. SER:  Yes, Your Honor.  At this time, Mr. Da Silva

7   requests the Court allocute him on a plea of guilty to the lone

8   count of the Information in 20-cr-97, so that he may change his

9   plea from not guilty to guilty.

10         THE COURT:  Okay.  Fair enough.  And this is pursuant

11  to a plea agreement dated February 4th, 2020; is that correct?

12  That's what I have, anyway.

13         MR. SER:  Yes, Your Honor.

14         THE COURT:  All right.  Okay.

15         Mr. Da Silva -- by the way, Mr. Ser, I notice that in

16  the Information his name is Javier Enrique Da Silva Rojas.  He

17  would prefer to be referred to as -- or to be identified as

18  "Mr. Da Silva;" is that correct?

19         THE DEFENDANT:  Yes, Your Honor.

20         THE COURT:  Okay.  So, Mr. Da Silva, I have been

21  informed that you wish to plead guilty to Count One of a felony

22  Information under docket number 20-cr-97; is that correct?

23         THE DEFENDANT:  Yes, Your Honor.

24         THE COURT:  Now, before I can accept your guilty plea,

25  I need to ask you certain questions, and it's very important

1   that you answer these questions honestly and completely, and I

2   am doing this because I need to make sure that you understand

3   your rights and that you are pleading guilty voluntarily and of

4   your own free will.  I also want to make sure that you are

5   pleading guilty because you are guilty and not for some other

6   reason, and that you fully understand the consequences of your

7   plea.

8           So if at any point during the proceedings today you do

9   not understand my questions or you want to speak to your lawyer,

10  please just tell me that, and I will let you do -- I will let

11  you speak to your lawyer.  The point is, it's very important for

12  you to understand every question before you answer it.  Okay?

13  So if you don't understand it, let me know, and either I will

14  explain it or I will let you speak to your lawyers.  Is that

15  okay?

16          THE DEFENDANT:  Yes, Your Honor.

17          THE COURT:  At this time, I am going to place you

18  under oath.

19          Ms. Hilbert, would you swear the defendant?

20          THE DEPUTY CLERK:  Certainly.

21  JAVIER ENRIQUE ROJAS DA SILVA, having been duly sworn, testified

22  as follows:

23          THE DEFENDANT:  Yes, I do.

24          THE COURT:  Okay.  Mr. Da Silva, you are now under

25  oath, and what that means is that if you answer any of my

```
 1  questions falsely, you could later be prosecuted for perjury or
 2  for making a false statement.  Do you understand that?
 3           THE DEFENDANT:  Yes, Your Honor.
 4           THE COURT:  All right.  You can have a seat.
 5           Mr. Da Silva, what is your full name?
 6           THE DEFENDANT:  Javier Enrique Da Silva Rojas.
 7           THE COURT:  How old are you, sir?
 8           THE DEFENDANT:  I am 25 years old.
 9           THE COURT:  And how far did you go in school?
10           THE DEFENDANT:  College.
11           THE COURT:  Okay.  So you graduated high school?  And
12  you have some college?
13           THE DEFENDANT:  Yes, Your Honor.
14           THE COURT:  I am sorry, Peter.  I apologize.
15           Did you graduate from college?
16           THE DEFENDANT:  No, Your Honor.
17           THE COURT:  Where did you go to college?
18           THE DEFENDANT:  In Venezuela.
19           THE COURT:  Are you currently or have you recently
20  been under the care of a doctor or a psychiatrist for any
21  reason?
22           THE DEFENDANT:  No, Your Honor.
23           THE COURT:  Have you ever been treated or hospitalized
24  for any mental illness or mental health problem, ever?
25           THE DEFENDANT:  No, Your Honor.
```

```
 1              THE COURT:  Have you ever been treated or hospitalized
 2   for any drug problem or alcohol abuse or addiction?
 3              THE DEFENDANT:  No, Your Honor.
 4              THE COURT:  In the last 24 hours, have you taken any
 5   drugs?
 6              THE DEFENDANT:  No, Your Honor.
 7              THE COURT:  Have you taken any medicine or pills in
 8   the last 24 hours?
 9              THE DEFENDANT:  No, Your Honor.
10              THE COURT:  And have you consumed any alcohol in the
11   last 24 hours?
12              THE DEFENDANT:  No, Your Honor.
13              THE COURT:  Is your mind clear today?
14              THE DEFENDANT:  Yes, Your Honor.
15              THE COURT:  Do you understand what is happening here
16   today?
17              THE DEFENDANT:  Yes, Your Honor.
18              THE COURT:  Have you had enough time and opportunity
19   to discuss your case with your attorneys?
20              THE DEFENDANT:  Yes, Your Honor.
21              THE COURT:  Have you discussed with them the charges
22   against you, including any possible defenses that you might
23   have?
24              THE DEFENDANT:  Yes, Your Honor.
25              THE COURT:  Have you discussed with them the
```

1  consequences of entering a plea of guilty?

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  And are you satisfied with your attorneys'

4  representation of you?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  Does either counsel have any doubt as to

7  the defendant's competence to plead guilty at this time?

8          MR. ANDREWS:  No, Your Honor.

9          THE COURT:  Mr. Ser?

10         MR. SER:  No, Your Honor.

11         THE COURT:  Okay.  Based on the defendant's responses

12  to my questions and my observations of his demeanor, I find that

13  he is fully competent to enter an informed guilty plea at this

14  time.

15         And again, Mr. Ser, he has already waived Indictment,

16  correct?

17         MR. ANDREWS:  That is correct, Your Honor.

18         THE COURT:  Mr. Da Silva, I am now going to explain

19  certain rights that you have under the Constitution and laws of

20  the United States.  These are rights that you will be giving up

21  if you enter a guilty plea.  So, again, please tell me if there

22  is anything you don't understand, and either I or your attorney

23  will explain the matter more fully.

24         First of all, you have the right to plead not guilty

25  to the charge contained in this Information, or persist in your

1  previously entered plea of not guilty.  Do you understand that?

2           THE DEFENDANT:  Yes, Your Honor.

3           THE COURT:  And if you plead not guilty, then you have

4  the right to a speedy and public trial by an impartial jury on

5  the charges contained in the Indictment.  Do you understand

6  that?

7           THE DEFENDANT:  Yes, Your Honor.

8           THE COURT:  At that trial, you would be presumed to be

9  innocent, and the government would be required to prove you

10 guilty by competent evidence beyond a reasonable doubt before

11 you could be found guilty.  What that means is that you would

12 not have to prove that you were innocent.  Do you understand

13 that?

14          THE DEFENDANT:  Yes, Your Honor.

15          THE COURT:  If there were a jury trial, you could not

16 be convicted unless a jury of 12 people unanimously agree that

17 you were guilty beyond a reasonable doubt.  Do you understand

18 that?

19          THE DEFENDANT:  Yes, Your Honor.

20          THE COURT:  At that trial, and at every other stage of

21 the case, you would have the right to be represented by an

22 attorney, and if you could not afford an attorney, the Court

23 would appoint one, or in this case, two, to represent you.  Do

24 you understand that?

25          THE DEFENDANT:  Yes, Your Honor.

1       THE COURT:  During a trial, the witnesses for the

2   government would have to come to court and testify in your

3   presence, and your lawyer could confront and cross-examine those

4   witnesses and object to evidence offered by the government.  Do

5   you understand that?

6       THE DEFENDANT:  Yes, Your Honor.

7       THE COURT:  At a trial, your lawyer could also offer

8   evidence on your behalf, and you would have the right to use

9   subpoenas to compel witnesses to testify and to obtain evidence

10  to be offered in your defense.  Do you understand that?

11      THE DEFENDANT:  Yes, Your Honor.

12      THE COURT:  At a trial, you would have the right to

13  testify if you chose to do so, but you would also have the right

14  not to testify; and if you chose not to testify, that could not

15  be used against you in any way.  No inference or suggestion of

16  guilt could be drawn from the fact that you did not testify.  Do

17  you understand that?

18      THE DEFENDANT:  Yes, Your Honor.

19      THE COURT:  If you were convicted at a trial, you

20  would have the right to appeal that verdict to a higher court.

21  Do you understand that?

22      THE DEFENDANT:  Yes, Your Honor.

23      THE COURT:  And you also understand that even now you

24  have the right to change your mind.  In other words, you could

25  persist in your previously-entered not guilty plea, and you can

 1  go to trial.  Do you understand that?

 2           THE DEFENDANT:  Yes, Your Honor.

 3           THE COURT:  But if you do plead guilty, and if I

 4  accept your plea, you will be giving up your right to a trial

 5  and all the other rights that go with it that I have just

 6  described other than the right to an attorney.  If you plead

 7  guilty, there will be no trial, and I will enter a judgment of

 8  guilty and sentence you on the basis of your guilty plea after I

 9  consider a presentence report prepared by the probation

10  department and any -- and also consider any submissions that I

11  get from you, your lawyer and the government.

12           Do you understand all of that?

13           THE DEFENDANT:  Yes, Your Honor.

14           THE COURT:  Finally, if you do plead guilty, you will

15  also be giving up your right not to incriminate yourself, and I

16  will ask you questions about what you did in order to satisfy

17  myself that you are, in fact, guilty as charged.  Do you

18  understand that?

19           THE DEFENDANT:  Yes, Your Honor.

20           THE COURT:  Okay.  Have you received a copy of the

21  Information?  Again, it's 20-cr-97.

22           THE DEFENDANT:  Yes, Your Honor.

23           THE COURT:  Have you read the Information?

24           THE DEFENDANT:  Yes, Your Honor.

25           THE COURT:  Did you do that with the assistance of the

1  interpreter?

2           THE DEFENDANT:  Yes, Your Honor.

3           THE COURT:  And have you discussed the information

4  with your attorneys with the assistance of the interpreter?

5           THE DEFENDANT:  Yes, Your Honor.

6           THE COURT:  Do you understand that you were charged in

7  Count One of the Information?  It's the only count.  There is

8  only one count.  You are charged with kidnapping, and

9  specifically, you are charged with unlawfully confining and

10 abducting and carrying away, et cetera, another person; and that

11 that person was willfully transported in interstate commerce,

12 and then, specifically that you kidnapped a woman by the name of

13 Valerie Reyes in New Rochelle, New York.  This was on or about

14 January 28, 2019; that you bound her feet and hands; that you

15 placed packing tape over her mouth; put her in a suitcase and

16 transported her from New Rochelle to Greenwich, Connecticut

17 where you disposed of her body.

18           Do you understand that that's what you're charged

19 with?

20           THE DEFENDANT:  Yes, Your Honor.

21           THE COURT:  Mr. Andrews, could you tell me the

22 essential elements of the offense charged in Count One?

23           MR. ANDREWS:  In order to prove the defendant guilty

24 to Count One, kidnapping in violation of 18 United States Code

25 1201(a)(1), the government would have to prove each of the

1  following elements beyond a reasonable doubt:  First, the victim

2  was seized, confined, inveigled, decoyed, kidnapped, abducted or

3  carried away.

4          Second, the victim was held for ransom, reward, or

5  otherwise.

6          Third, that the victim was transported in interstate

7  or foreign commerce, traveled in interstate or foreign commerce

8  or mail or any means of -- means, facility or instrumentality of

9  interstate or foreign commerce, was used in committing or in

10 furtherance of the offense.

11         And fourth, that the defendant acted knowingly,

12 willingly, and unlawfully.

13         In addition, the government would also be required to

14 demonstrate by a preponderance of the evidence that venue is

15 proper in the Southern District of New York.

16         THE COURT:  Okay.  Thank you, Mr. Andrews.

17         Mr. Da Silva, do you understand that if you did not

18 plead guilty to Count One, the government would have to prove

19 each and every element of that charge beyond a reasonable doubt

20 at trial?

21         THE DEFENDANT:  Yes, Your Honor.

22         THE COURT:  By the way, Mr. Andrews, I think you said

23 "willingly."  Did you mean to say willfully for the fourth

24 element?  Knowingly, willfully and unlawfully?

25         MR. ANDREWS:  That is correct, Your Honor.

```
1              THE COURT:  All right.  So the fourth element is that
2   the defendant acted knowingly, willfully and unlawfully; is that
3   correct?
4              MR. ANDREWS:  That's correct, Your Honor.
5              THE COURT:  Again, Mr. Da Silva, do you understand
6   that if you did not plead guilty to Count One, the government
7   would have to prove each and every element of that charge beyond
8   a reasonable doubt at trail, including the element that I just
9   mentioned, that you acted knowingly, willfully and unlawfully?
10             THE DEFENDANT:  Yes, Your Honor.
11             THE COURT:  All right.  I am now going to tell you
12  about the possible maximum penalty for that offense as follows:
13  The maximum term of imprisonment here is life in prison.  There
14  is a maximum term of supervised release of five years.  There is
15  a maximum fine -- again, these are all possible maximums -- of
16  the greatest of $250,000 or twice the gross pecuniary gain
17  derived from the offense or twice the gross pecuniary loss to
18  persons other than you resulting from the offense; and finally,
19  there is a $100 mandatory special assessment that applies in
20  every case.
21             Do you understand that these are the maximum possible
22  penalties for this offense?
23             THE DEFENDANT:  Yes, Your Honor.
24             THE COURT:  And there is no mandatory minimum in this
25  case; is that right, Mr. Andrews?
```

 1              MR. ANDREWS:  That's correct, Your Honor.

 2              THE COURT:  All right.  And also, Mr. Da Silva, under

 3   the law, I can also -- I can order you to pay restitution to any

 4   person or entity injured as a direct result of your criminal

 5   conduct.  Do you understand that?

 6              THE DEFENDANT:  Yes, Your Honor.

 7              THE COURT:  And, Mr. Andrews, is the government going

 8   to be seeking restitution in this case?  And if so, for what?  I

 9   don't see it specifically mentioned in the plea agreement, but

10   there is no question that restitution is a possible punishment.

11              MR. ANDREWS:  It's not in the plea agreement, you are

12   correct, Your Honor.  However, it is set forth within -- we

13   believe that the evidence will show at the time of sentencing

14   that the defendant did take a substantial quantity of money from

15   the victim.  So restitution would be appropriate within the

16   Court's authority.

17              THE COURT:  Could you put an approximate number on

18   that?

19              MR. ANDREWS:  Within the range of 5 to $10,000, Your

20   Honor.

21              THE COURT:  Okay.  Is that your understanding as well,

22   Mr. Ser, that there is a potential restitution judgment here up

23   to $10,000?

24              MR. SER:  Yes, Your Honor.

25              THE COURT:  All right.

1          Okay.  So, again, Mr. Da Silva, do you understand that

2   I could order you to pay restitution in this case?

3          THE DEFENDANT:  Yes, Your Honor.

4          THE COURT:  And I mentioned supervised release a

5   minute ago, and that means that if I subject you to prison to be

6   followed by a term of supervised release, you will be subject to

7   supervision by the probation department after your release from

8   prison; and if you violate any of the conditions of supervised

9   release that would apply, the term of supervised release could

10  be revoked, and you could be returned to prison without a jury

11  trial to serve additional time even beyond your original

12  sentence.  If that happened, you would not be given credit for

13  the time served in prison on your original sentence or for any

14  time spent on supervised release.  Do you understand that?

15         THE DEFENDANT:  Yes, Your Honor.

16         THE COURT:  You should also understand that parole has

17  been abolished in the federal system, so if you are sentenced to

18  prison, you will not be released early on parole.  Do you

19  understand that?

20         THE DEFENDANT:  Yes, Your Honor.

21         THE COURT:  Now, Mr. Da Silva, are you a United States

22  citizen?

23         THE DEFENDANT:  No, Your Honor.

24         THE COURT:  What is your immigration status if you

25  know?  Do you have a green card?  Are you here without

1   documents?  If you know.

2             Do you know, Mr. Ser?

3             MR. SER:  Yes, Your Honor.  He overstayed a visa.

4             THE COURT:  So he was here on a visa, and then he

5   overstayed it?

6             MR. SER:  Correct.

7             THE COURT:  Is that correct, Mr. Da Silva?

8             THE DEFENDANT:  Yes, Your Honor.

9             THE COURT:  Do you understand that in all likelihood

10  you will be deported from the United States after you complete

11  service of your sentence?

12            THE DEFENDANT:  Yes, Your Honor.

13            THE COURT:  And do you also understand that if, for

14  some reason, you are not deported from the United States after

15  serving your sentence, or if after you serve your sentence, you

16  are held in the U.S. pending deportation, you will still be

17  subject to supervised release?

18            THE DEFENDANT:  Yes, Your Honor.

19            THE COURT:  Do you understand that if you are

20  deported, returning to the United States during your period of

21  supervised release without permission from the Secretary of the

22  U.S.  Department of Homeland Security, would not only be a

23  separate crime, but it would also be a violation of your

24  conditions of supervised release, and you could be sent back to

25  prison without a trial?  Do you understand that?

```
 1                THE DEFENDANT:  Yes, Your Honor.

 2                THE COURT:  And do you understand that the same would

 3   be true of any crime committed while in custody pending

 4   deportation?

 5                THE DEFENDANT:  Yes, Your Honor.

 6                THE COURT:  Do you further understand that if I accept

 7   your guilty plea and adjudge you guilty, that adjudication may

 8   deprive you of valuable civil rights such as the right to vote,

 9   the right to hold public office, the right to serve on a jury,

10   the right to possess any kind of firearm, and the right to hold

11   certain professional licenses?

12                THE DEFENDANT:  Yes, Your Honor.

13                THE COURT:  Mr. Ser, have you advised the defendant

14   about the possible immigration consequences of entering a plea

15   of guilty to the charge of Count One of the Information?

16                MR. SER:  I have.

17                THE COURT:  And have you told him that deportation is

18   likely after completion of service of his sentence?

19                MR. SER:  Yes.

20                THE COURT:  All right.  Mr. Da Silva, has your lawyer

21   advised you as to the possible immigration consequences of your

22   plea?

23                THE DEFENDANT:  Yes, Your Honor.

24                THE COURT:  And do you understand that there could be

25   adverse immigration consequences, including deportation or
```

1   denial of citizenship or denial of admission to the United

2   States in the future as a result of your guilty plea?

3                THE DEFENDANT:  Yes, Your Honor.

4                THE COURT:  Do you understand that if there are

5   adverse immigration consequences as a result of your guilty

6   plea, you will not be able to withdraw your plea?  In other

7   words, you won't be able to take it back, and you also won't be

8   able to appeal or otherwise challenge your conviction on the

9   basis of those immigration consequences?

10                THE DEFENDANT:  Yes, Your Honor.

11                THE COURT:  Just one second.

12                Now, have you talked to your lawyer about how the

13   federal sentencing guidelines apply to your case?

14                THE DEFENDANT:  Yes, Your Honor.

15                THE COURT:  And I need to tell you that in determining

16   the sentence to impose, I am required to consider the

17   guidelines, which are a set of rules and recommendations for

18   determining an appropriate sentence.  I have to calculate the

19   applicable guideline range.  I have to consider that range, and

20   I have to determine whether there should be an upward or

21   downward departure from that range.

22                In addition, I am required to consider the sentencing

23   factors set forth in Section 3553(a) of Title 18 of the United

24   States Code and to impose a sentence that I believe best

25   satisfies the purposes of the criminal law, even if that

1  sentence is higher or lower than what the guidelines recommend.

2  Do you understand all of that?

3            THE DEFENDANT:  Yes, Your Honor.

4            THE COURT:  And do you also understand that I will not

5  be able to determine how the guidelines apply to your case until

6  after the presentence report has been prepared by the probation

7  office, and both you and the government have had a chance to

8  review, comment on, and object to anything in the report?

9            THE DEFENDANT:  Yes, Your Honor.

10           THE COURT:  Do you also understand that if your

11 attorney or anyone else has attempted to predict what your

12 sentence will be, that prediction could be wrong?

13           THE DEFENDANT:  Yes, Your Honor.

14           THE COURT:  And I am telling you this because you need

15 to understand that no one, not even your attorney or the

16 government's attorney, can be sure now what your sentence will

17 be.  It's my job to decide what your sentence will be, and I am

18 not going to do that now.  Instead, I am going to wait until

19 after the presentence report is completed and after I have ruled

20 on any challenges to the report, calculated the range,

21 determined whether there are grounds to depart and considered

22 the Section 3553(a) factors.

23           So at this point, nobody can predict what the sentence

24 will be in your case.  Do you understand that?

25           THE DEFENDANT:  Yes, Your Honor.

PROCEEDINGS                    20

```
 1              THE COURT:  Do you also understand that even if your

 2   sentence is different from what your attorney or anyone else

 3   told you it might be, or if it's different from what you

 4   expected it to be or from what's contained in your plea

 5   agreement, once you have pleaded guilty, you will not be allowed

 6   to withdraw your plea?

 7              THE DEFENDANT:  Yes, Your Honor.

 8              THE COURT:  Has anyone threatened you or coerced you

 9   in any way or tried to force you to plead guilty?

10              THE DEFENDANT:  No, Your Honor.

11              THE COURT:  And has anyone other than the prosecutor

12   promised you anything or offered you anything in order to get

13   you to plead guilty?

14              THE DEFENDANT:  No, Your Honor.

15              THE COURT:  I have been given a letter dated

16   February 4th, 2020, from the government's attorney to your

17   attorney, which is a plea agreement between you and the

18   government, and in a moment I will have it marked as Court

19   Exhibit 1, but first I am going to have my clerk verify that

20   your signature appears on page 7 of the agreement.

21              THE DEPUTY CLERK:  Mr. Da Silva, is that your original

22   signature signed today, February 5th, 2020?

23              THE DEFENDANT:  Yes.

24              THE COURT:  Mr. Da Silva, did you read this agreement

25   before you signed it with the assistance of the interpreter?
```

1           THE DEFENDANT:  Yes, Your Honor.

2           THE COURT:  Did you discuss it with your attorneys

3  before you signed it?

4           THE DEFENDANT:  Yes, Your Honor.

5           THE COURT:  Did you discuss every aspect of it?

6           THE DEFENDANT:  Yes, Your Honor.

7           THE COURT:  And did you understand the agreement at

8  the time you signed it?

9           THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  Is this plea agreement the entire

11  agreement between you and the government?

12          THE DEFENDANT:  Yes, Your Honor.

13          THE COURT:  Is there any other agreement, promise or

14  understanding between you and the government that's been left

15  out of the agreement?

16          THE DEFENDANT:  No, Your Honor.

17          THE COURT:  Did anyone threaten you or coerce you or

18  force you to enter into the plea agreement?

19          THE DEFENDANT:  No, Your Honor.

20          THE COURT:  And other than what's contained in the

21  plea agreement, has anyone promised you anything or offered you

22  any inducement to plead guilty or to enter into the plea

23  agreement?

24          THE DEFENDANT:  No, Your Honor.

25          THE COURT:  Has anyone made you a promise as to what

1 your sentence will actually be?

2          THE DEFENDANT:  No, Your Honor.

3          (Court Exhibit 1 in Evidence)

4          THE COURT:  Now, it appears that both and you the

5 government have stipulated to, which simply means agreed to, the

6 appropriate calculation of your sentencing range under the

7 guidelines; is that correct?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  And according to the stipulation, the

10 agreed-upon sentencing range is 360 months to life imprisonment.

11 In other words, 30 years to life is the agreed-upon sentencing

12 range.

13          Do you understand that the guidelines stipulation in

14 the plea agreement is binding on you, and it's binding on the

15 government, but it's not binding on me?

16          THE DEFENDANT:  Yes, Your Honor.

17          THE COURT:  Do you understand that regardless of what

18 you and the government have agreed to, I am going to make my own

19 determination of your guideline range?

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  Do you understand that under certain

22 circumstances, both you and the government have the right to

23 appeal any sentence that I might impose subject to the terms of

24 the plea agreement?

25          THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  And there appears to be on page 4 of the

2 agreement what lawyers call an appeal waiver provision.  Do you

3 understand that under the plea agreement you are giving up your

4 right to appeal or otherwise challenge your sentence so long as

5 I sentence you to life imprisonment, which is the top of the

6 range, or less?

7          THE DEFENDANT:  Yes, Your Honor.

8          THE COURT:  And there is no forfeiture provision in

9 this case, correct?

10          MR. ANDREWS:  That's correct, Your Honor.

11          THE COURT:  All right.  Mr. Da Silva, have you clearly

12 understood everything that has happened here so far today?

13          THE DEFENDANT:  Yes, Your Honor.

14          THE COURT:  Now that you have been advised of the

15 charge against you, the possible penalties that you face, and

16 the rights you are giving up, is it still your intention to

17 plead guilty to Count One of the Information?

18          THE DEFENDANT:  Yes, Your Honor.

19          THE COURT:  With respect to Count One of the

20 Information, how do you now plead, guilty or not guilty?

21          THE DEFENDANT:  Guilty.

22          THE COURT:  Are you, in fact, guilty of that charge?

23          THE DEFENDANT:  Yes, Your Honor.

24          THE COURT:  And are you pleading guilty voluntarily

25 and of your own free will?

1            THE DEFENDANT:  Yes, Your Honor.

2            THE COURT:  Okay.  Mr. Andrews, would you please

3  summarize what the government would expect to prove if this case

4  went to trial?

5            MR. ANDREWS:  The government's proof at trial would

6  consist of the following:  First, witness testimony that the

7  defendant and the victim dated from in or about January 2018 to

8  April 2018, after which the victim ended the relationship.

9            Second, witness testimony and bank records showing

10  that the defendant used the victim's debit card without

11  authorization in or about September 2018, approximately five

12  months prior to the kidnapping.

13            Third, surveillance footage showing that on or about

14  January 28th, the defendant left his apartment and rented a

15  vehicle.

16            THE COURT:  That's 2019?

17            MR. ANDREWS:  2019, Your Honor.

18            THE COURT:  Go ahead.

19            MR. ANDREWS:  Fourth, Google location data and cell

20  site data showing that the defendant then drove to New Rochelle

21  and turned his phone on airplane mode approximately 200 feet

22  from the victim's home.

23            Fifth, bank records showing that several hours later,

24  someone accessed the victim's Chase Bank application on her

25  phone using the victim's thumbprint and checked her account

1  balance.

2         Sixth, bank records and surveillance footage showing

3  that approximately 30 minutes later, an individual dressed

4  entirely in black, who would be proven at trial was the

5  defendant, withdrew a thousand dollars from the victim's bank

6  account from a nearby ATM.

7         Seventh, cell site data showing that the defendant

8  then traveled to Greenwich, Connecticut and back to New York.

9         Eighth, bank records and surveillance footage showing

10  that over the next several days an individual, who would be

11  proven at trial was the defendant, withdrew approximately $5,350

12  from the victim's bank account using the victim's debit card.

13         Ninth, witness testimony that the victim's body was

14  found in a suitcase dumped next to the road in Greenwich,

15  Connecticut several days later on or about February 5th, 2019.

16  The victim's mouth was covered with several layers of packing

17  tape, and her feet and hands were bound with packing tape and

18  twine.  The victim additionally had a number of injuries,

19  including a large bruise on her forehead, as well as various

20  abrasions on her face and hemorrhages to her scalp.

21         Tenth, testimony from the Connecticut Medical

22  Examiner's office that the victim died of homicidal

23  asphyxiation.

24         Eleventh, records showing that the same day that the

25  victim's body was found, the defendant re-rented the same

1  vehicle that he had used to drive to the victim's home and drove

2  it to the vicinity of a car wash.

3          Twelve, statements from the defendant during his post

4  arrest interview that he traveled to the victim's apartment on

5  the night in question, bound her while she was still alive, and

6  withdrew money from her bank account during the next several

7  days.

8          Thirteen, DNA evidence showing that the defendant's

9  DNA was under the fingernails of the victim when she was found.

10         Fourteen, witness testimony and photos recovered from

11 the defendant's phone showing the defendant had several injuries

12 the day after the kidnapping, including a laceration below his

13 left eye.

14         Fifteen, text messages from the defendant's phone

15 showing that during the days after the kidnapping, the defendant

16 stole -- sold an iPad that he had stolen from the victim's house

17 on the night of the kidnapping, and a photo of the defendant

18 posing with a computer television that he received in return for

19 the stolen iPad.

20         THE COURT:  Okay.  Thank you, Mr. Andrews.

21         Mr. Da Silva, did you hear what the prosecutor just

22 said?

23         THE DEFENDANT:  Yes, Your Honor.

24         THE COURT:  Is it substantially accurate?

25         THE DEFENDANT:  Yes, Your Honor.

```
 1              THE COURT:  Okay.  I need you now to tell me in your
 2  own words what you did to make you believe that you are guilty
 3  of this offense.
 4              And is the defendant planning to read a statement, Mr.
 5  Ser?
 6              MR. SER:  Yes, Your Honor.
 7              THE COURT:  Is this a statement you prepared working
 8  with him?
 9              MR. SER:  Yes, Your Honor.
10              THE COURT:  I just want to make sure it's his
11  statement ultimately.
12              MR. SER:  It is, Your Honor.
13              THE COURT:  Mr. Da Silva, are you going to read from a
14  statement in response to my question about telling me what you
15  believe you did that makes you guilty of this offense?
16              THE DEFENDANT:  Yes, Your Honor.
17              THE COURT:  Did you prepare that statement with the
18  assistance of your lawyers?
19              THE DEFENDANT:  Yes, Your Honor.
20              THE COURT:  Okay.  Go ahead.
21              THE DEFENDANT:  From on or about January 28, 2019, to
22  on or about January 29, 2019, in New Rochelle, New York -- in
23  New Rochelle, New York, after a violent struggle in her
24  apartment while Valerie Reyes was still alive, I bound her feet
25  and hands, placed tape over her mouth, put her in a suitcase,
```

1  and transported her to Greenwich, Connecticut where I disposed

2  of her body.  My above actions, which I knew to be illegal,

3  resulted in the death of Ms. Reyes.

4        THE COURT:  Okay.  I have a couple of questions,

5  Mr. Da Silva.

6        First of all, just tell me again where -- where was

7  Ms. Reyes' apartment in which you had this violent struggle?

8  What town or city?

9        THE DEFENDANT:  In New Rochelle.

10       THE COURT:  Here in Westchester County?

11       THE DEFENDANT:  Yes, Your Honor.

12       THE COURT:  And after you put Ms. Reyes in the

13  suitcase, you took her to Connecticut.  Where in Connecticut?

14       THE DEFENDANT:  Greenwich, Connecticut.

15       THE COURT:  Mr. Ser, could you just help me out maybe

16  with the second element as described by Mr. Andrews earlier?

17  Namely -- this is a paraphrase, of course -- that the victim was

18  held -- held for ransom and reward and otherwise.  Or otherwise.

19  What are the facts that meet that element?

20       MR. SER:  Your Honor, as he allocuted and explained,

21  he taped her hands together and ankles and covered her mouth in

22  order to be able to avoid arrest and prosecution by preventing

23  her from alerting authorities to the events that occurred in the

24  apartment.

25       THE COURT:  And that's being held for ransom or reward

1    or otherwise?

2            MR. SER:  Or otherwise.

3            THE COURT:  Okay.  So what you are saying is that by

4    binding and gagging Ms. Reyes and putting her in the suitcase,

5    he not only carried her away, but he held her for otherwise,

6    meaning for some other benefit, namely not being arrested or

7    having his crimes detected?

8            MR. SER:  Correct, Your Honor.

9            THE COURT:  Do you agree that's sufficient to meet

10   that element of the -- I don't have the problem with the other

11   elements -- is that sufficient to meet that element of the

12   statute?

13           MR. ANDREWS:  Yes, Your Honor.  Our understanding

14   under the Second Circuit case law is it doesn't have to be a

15   monetary benefit for it to reach the otherwise requirement.

16   That standard is actually deliberately quite, quite low in the

17   context of the kidnapping statute, and this would be sufficient.

18           THE COURT:  Right.  I mean, obviously, I am asking --

19   well, I am asking the question because I want to make sure that

20   we are covering all the elements, but also, this is not,

21   strictly speaking, a homicide charge.  This is a kidnapping

22   charge.  If it was a homicide charge, we probably wouldn't have

23   this conversation, but it's a kidnapping charge.

24           But you agree that the statements that Mr. Da Silva

25   made are sufficient to meet the element about being held for

1   ransom or reward or otherwise?

2            MR. ANDREWS:  Yes, Your Honor.

3            THE COURT:  And you agree with that as well, Mr. Ser?

4            MR. SER:  I do.

5            THE COURT:  Mr. Da Silva, did you know that at the

6   time you were doing these things that you told me about, that

7   what you were doing was wrong and against the law?

8            THE DEFENDANT:  Yes, Your Honor.

9            THE COURT:  Did anyone threaten you or coerce you or

10  force you to do these things?

11           THE DEFENDANT:  No, Your Honor.

12           THE COURT:  Mr. Andrews, do you believe there is a

13  sufficient factual predicate for the guilty plea as to all of

14  the elements?

15           MR. ANDREWS:  Yes, Your Honor.

16           THE COURT:  Do you agree with that, Mr. Ser?

17           MR. SER:  Yes, Your Honor.

18           THE COURT:  Are there any additional questions that

19  either of you would like me to ask the defendant?

20           Mr. Andrews?

21           MR. ANDREWS:  Your Honor, just out of an abundance of

22  caution, if you wouldn't mind allocuting the defendant on one

23  specific provision within the plea agreement, which is located

24  on page 5?

25           THE COURT:  Yes.  I'm happy to do that.  Tell me what

 1  that is.

 2          MR. ANDREWS:  So that provision in the plea agreement,

 3  which the plea agreement asserts that it is very likely that the

 4  guilty plea and conviction will make deportation from the United

 5  States presumptively mandatory.  I believe the Court has

 6  informed that there could be deportation, but the government is

 7  asserting that it's very likely.

 8          THE COURT:  Just tell me where.  I am looking at

 9  page 5.

10          MR. ANDREWS:  It's page 5, the --

11          THE COURT:  The really long paragraph in the middle

12  that has about 500 words in it?  That one?

13          MR. ANDREWS:  Yes.

14          THE COURT:  All right.  Let me see if I can find that

15  one.  Hold on one second.

16          I think I asked him or I said to him before, are you

17  aware that it's likely that you will be removed?  The only --

18  and he said yes.  And you are asking me to ask him whether he

19  understands that it's very likely that he will be removed?

20          MR. ANDREWS:  It's out -- it's out of an abundance of

21  caution, Your Honor, just because the terminology -- at one

22  point Your Honor said that he could be deported; just so that

23  the defendant is aware of what the government's position is.

24          THE COURT:  No problem.

25          Mr. Da Silva, do you understand that your guilty plea

1  in this case, assuming I accept the guilty plea, makes it very

2  likely that you will be removed from the United States, indeed,

3  that your removal is presumptively mandatory?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  Thank you.  And also that, at a minimum,

6  you are at risk of being removed or suffering other adverse

7  immigration consequences?  Do you understand all of that?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  There is actually something else I wanted

10 to allocute him about that's in the plea agreement if you just

11 give me a second.

12          On page 3 of the plea agreement, it says, and I quote,

13 "The parties agree that, one, the defendant will not seek a

14 sentence or otherwise suggest in any way that the probation

15 office or the Court consider a sentence of less than 360 months'

16 imprisonment; and two, unless this office," meaning the U.S.

17 Attorney's office, "learns of new information regarding the

18 defendant's conduct, including conduct after the execution of

19 the plea agreement, this office will not seek a sentence or

20 suggest in any way that the probation office or the Court

21 consider a sentence of more than 360 months' imprisonment."

22          And then it has the following sentence:  "The parties

23 understand that this agreement reflects the special facts of

24 this case and is not intended as precedent for other cases."

25          So, first of all, Mr. Ser, did you go over this

1 paragraph line by line and word for word with your client?

2          MR. SER:  Yes, Your Honor, with the assistance of the

3 interpreter.

4          THE COURT:  All right.  Mr. Da Silva, is that correct,

5 that you reviewed this particular language that I've just quoted

6 with your attorney and with the assistance of the interpreter?

7          THE DEFENDANT:  Yes, Your Honor.

8          THE COURT:  And do you understand that what that means

9 is that you are agreeing -- and, again, this is an agreement

10 between you and the government.  It's not -- I don't -- I am not

11 a party to this agreement, but you and the government have

12 agreed -- this is the relevant part here -- you and the

13 government have agreed that you will not even ask for a sentence

14 of less than 30 years in prison?

15          THE DEFENDANT:  Yes, Your Honor.

16          THE COURT:  While we are on the subject of the

17 guidelines, on page 2 of the plea agreement, it says that the

18 applicable guideline is Section 2A1.1, and the base offense

19 level is 43 because death resulted from the offense charged in

20 Count One.

21          Again, this is the same question.  Did you discuss

22 this provision in the plea agreement line by line and word for

23 word with your client?

24          MR. SER:  Yes, Your Honor, with the assistance of the

25 interpreter.

1          THE COURT:  And, Mr. Da Silva, did you discuss that

2   provision with your attorney?

3          THE DEFENDANT:  Yes, Your Honor.

4          THE COURT:  And the next paragraph, paragraph 4 on

5   page 2 says that, "The parties agree that the defendant

6   willfully obstructed or impeded or attempted to obstruct and

7   impede the administration of justice during the course of the

8   investigation, and that that obstructive conduct related to the

9   defendant's offensive conviction and any relevant conduct, and

10  therefore, the offense level is increased by two levels."

11         What was his conduct after the offense was committed

12  that constitutes obstruction of justice?  Just tell me what that

13  is, Mr. Andrews.

14         MR. ANDREWS:  That was when the defendant re-rented

15  the vehicle that he had originally driven to the victim's house,

16  Your Honor.  We believe that the evidence shows that he took it

17  to a car wash and subsequently cleaned the vehicle in order to

18  prevent law enforcement from finding anything inside it that

19  would connect him to the kidnapping.

20         THE COURT:  Just curious, how does one re-rent the

21  exact same car that you rented before?

22         MR. ANDREWS:  There is a specific vehicle service that

23  he was using, and you can choose your vehicle.  He had

24  apparently rented that vehicle several times in the past, and he

25  simply just chose it again.

1        THE COURT:  Do you agree with that, Mr. Ser, that

2  that's the basis for the obstruction of justice enhancement

3  here?

4        MR. SER:  Yes, Your Honor.

5        THE COURT:  Okay.  Any additional questions you would

6  like me to ask the defendant, Mr. Andrews?

7        MR. ANDREWS:  No, Your Honor.

8        THE COURT:  Mr. Ser, are there any additional

9  questions you would like me to ask the defendant?

10        MR. SER:  No, Your Honor.

11        THE COURT:  Then finally, Mr. Ser -- well, I can't

12  remember now whether I asked this question.  I apologize.  If I

13  did, I am asking it again.

14        Mr. Andrews, do you believe there is a sufficient

15  factual predicate for the guilty plea?

16        MR. ANDREWS:  Yes, Your Honor.

17        THE COURT:  And you agree with that, Mr. Ser?

18        MR. SER:  I do.

19        THE COURT:  And, finally, Mr. Ser, do you know of any

20  valid defense that would prevail at trial or any reason why your

21  client should not be permitted to plead guilty?

22        MR. SER:  No, Your Honor.

23        THE COURT:  Okay.  Based on the defendant's responses

24  to my questions and my observations of his demeanor, I find that

25  he understands his rights and is waiving them knowingly and

1  voluntarily with an understanding of the consequences of his

2  guilty plea, including the potential sentences that may be

3  imposed.

4          I further find that the guilty plea is voluntary and

5  did not result from force, threats or promises other than

6  promises in the plea agreement; that the defendant has admitted

7  he is guilty as charged in Count One of the Information, and

8  that the plea is supported by an independent factual basis for

9  each and every element of the crime charged.

10         Accordingly, I accept the guilty plea and adjudge the

11 defendant guilty of the charge in Count One.  I will direct the

12 probation department conduct a presentence investigation and

13 prepare a presentence report.

14         Mr. Da Silva, you are going to be interviewed by a

15 probation officer as part of that presentence investigation

16 process.  When that happens, your lawyer or lawyers will be with

17 you.  Just make sure that if you do speak to the probation

18 officer, that anything you say is truthful and accurate because

19 whatever you say is going to be reported to me, and if the

20 probation officer believes you are being truthful, that will be

21 reported to me.  It will also be reported to me if the probation

22 officer feels that you are being untruthful.  So I am directing

23 you to be truthful and accurate.  Will you do that?

24         THE DEFENDANT:  Yes, Your Honor.

25         THE COURT:  I also want you to know that the

1  presentence report that the probation officer will prepare is

2  important to me in deciding what sentence to impose.  Since it's

3  important to me, it's important to you, and specifically it's

4  important that you read the report carefully and discuss it with

5  your attorney before your sentencing date.  If there are any

6  mistakes in the report, tell your lawyer about them so that he

7  or they can bring them to my attention before I impose sentence.

8  Will you do that?

9            THE DEFENDANT:  Yes, Your Honor.

10           THE COURT:  Also, both you and your attorney will have

11  the right to speak on your behalf before I impose sentence, and

12  I think I was given a date here if I can find it.

13           How about May 21st, 2020, at 11:00 a.m.?

14           MR. ANDREWS:  Works for the government.

15           MR. SER:  That's fine, Your Honor.

16           THE COURT:  Okay.  Sentencing is scheduled for May 21,

17  2020, at 11:00 a.m.  The deadline for any written submissions by

18  the defendant ordinarily is ten days.  We are going to make it

19  two weeks in this case, so any submissions due two weeks before

20  sentencing, which in this case is May 7th; and any response from

21  the government is due one week before sentencing.  So that would

22  be May 14th.  So if the sentencing date changes, that would not

23  change the -- well, it would change, obviously, the date for

24  your submissions, but your submission is due two weeks before

25  sentencing, Mr. Ser.

1            And, Mr. Andrews, yours is due one week before

2   sentencing.

3            Okay.  The defendant has been detained, as I

4   understand it, during the course of this case.  That will

5   continue.

6            Is there anything else that we need to do today?

7            MR. ANDREWS:  No, Your Honor.

8            MR. SER:  No, Your Honor.

9            THE COURT:  All right.  Thank you all.  I will see you

10  on May 21st at 11:00 a.m.

11            THE DEPUTY CLERK:  All rise.  This court will be in

12  recess.

13            (Time noted:  1:36 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

# Statement 1

## Letter of impact, by Naomi De Jesus

It's been a little over a year and I'm still having a hard time accepting that one of my best friends is gone. My heart and my mind refuses to believe it's still true. Even though all this time has passed since her passing, it only feels like she's on vacation and one day she'll be back. I miss talking to her so so much. I would do anything to have her back. So much has happened in my life in just one year. So much that I wish I could tell her. Not having her around still doesn't seem normal. She was my number one person I would always go to, to share good news, to seek advice, or just hang out with to get a break from everything.

I still remember the first time I met her. She had bright red hair and was so friendly and kind to me. I met her through a mutual friend named Geo. He brought her to my house one day because my mother was giving away kittens. She'd came to take one home. I gave her my number that day in case she needed any advice of taking care of the kitten since I knew it was her first time having one. And that's when our friendship began. She lived alone and was completely clueless on what to do so she would always text me. We got to know each other very quickly and clicked from the beginning. We found out that we had a lot in common. We started hanging out and texting all the time. I learned so much about her the first year I met her.

One particular memory that I treasure so dearly is when we first went bike riding. Mostly everyone ride bikes. It's something a lot of us do when we're young. When Valerie asked if I wanted to go bike riding, it occurred to me that I haven't rode a bike in years. Something that I used to do a lot as child, I completely stopped doing when I became an adult. I was so excited to start again that I had my dad buy me a bike. Valerie wanted to ride our bikes from New Rochelle to Orchard Beach in the Bronx. Which was about a 5 mile bike ride. Even though I haven't rode a bike in a long time, I was down for the trip. I was completely out of shape but it ended up being the most fun I ever had in a long time. It was summer so it was very hot and humid that day. But when we finally reached the beach it was worth it. The view was amazing. The breeze felt refreshing. We didn't go swimming or buy ice cream. All we did was talk. She told me a lot about herself that day. She opened up about how she was bullied very badly in high school and how it affected her most her life. Told me about the things she regretted as a teenager and how much she had changed since then. I gained a lot of respect for her that day. The more I learned about her the more I began to admire her.

Anything Val wanted to do I was always down to do. She was very creative and adventurous. She always thought of fun things to do that usually cost little to no money at all. I loved that about her. Most of my friends, especially at that age, only wanted to drink, shop for clothes, party, or do things that

would cost a lot of money. Val and I would do simple things and would have an amazing time. Things such as going to the park to just walk around and admire the scenery. Going to different hiking trails and taking pictures. Even going camping together. We had so much fun when we went camping, another memory I'll treasure forever. Sometimes we would just stay at her place. We would talk a lot and get into deep conversations about life. That alone was always so fun. We didn't need drugs or alcohol to have fun and I love that. It said a lot about the type of person she was. She was always different from everyone else. But in a good way. Val helped me learn how to enjoy the little things in life. And that meant so much to me. It is something that I do all the time till this day because of her.

In many ways Val was a role model to me. At the time I didn't even notice. It wasn't until her passing that I began realizing how much of an impact she had on me. Words of advice, things she always recommended, even her way of living. I always looked up to Val. And I always wanted to be more like her. She was so unique in her own way. She did things different from everyone else. For example, she loved fashion and buying clothes. But she would never spend a fortune on one piece of clothing like most girls her age. She would always get her clothes on sale, from a thrift store, or as hand me downs from people she knew. And she knew how to style them to her liking. She was very creative. And Val would always make the best out of every situation.

Unfortunately, Valerie suffered from depression. It would occur periodically, sometimes randomly. And honestly, it was difficult for me to help her through those times. I was never sure what was the right way to handle it. But I made sure I was always there for her if she needed someone. There were times where it got really bad. She'd stopped talking to  everyone and wouldn't respond to any of our messages. Only to learn later that she would cut herself during those times. I hated seeing her like that and I hated feeling helpless. But no matter how bad it got, Valerie always pulled through. Always. She was such a strong person and never gave up. A major reason that kept her  around and stopped her from committing suicide, were her little brothers. She adored and loved them so so much. They meant everything to her. She couldn't even imagine not being around for her brothers. The thought of her mom being alone to raise her brothers without her, absolutely terrified her. A thought that now haunts me since she was killed.

People like Valerie are rare. Anyone she has ever met, she has left an impact on them. She was one of the most selfless and nonjudgemental person I have ever known. Even during her hardest times she was always there for her friends whenever we needed her. It breaks my heart knowing she is no longer with us. I know I would never meet someone like her again. I treasure every single memory I have

and replay them in my head all the time. I don't ever want to forget them. I don't ever want to forget her. I recently found out that I'm pregnant and it brought me both joy and sadness. Sad that I know Valerie will never be able to meet my future child. And my child will never get to meet the wonderful person she was. Valerie loved kids. Although she never wanted one of her own, I know she would've been so happy and excited to meet my little one. My child will never get to meet Valerie, but they will sure learn about her from all of the stories I have. And I will tell them how much should would've loved them if she was around. Because no matter what I will never stop talking about Valerie.

# Statement 2

~~To whom it may concern,~~

~~My name is Leslie Martinez~~
I was Valerie's friend and co-worker

On january 30th, that Valerie Reyes went missing and days later we found put that she was murdered by this guy Javier and knowing he admit it and confessed, pain hasn't gone away.

Words cannot express the pain and heartache our family, friends and co-workers are experiencing and will continue to experience. The defendants decision to take the life of Valerie with no regard for the effects it may have on others is unimaginable. Valerie had so much more life to live. She had dreams and goals of one day opening her own tattoo shop. She was so talented and loved art. She was a beautiful soul that was taken too soon. I lost a friend but her family lost a sister, a daughter, we all lost her smile.

The loss of a daughter, sister a friend is beyond words. There will be no more holidays to share with family or secret Santa at work with her peers. No more birthdays, random diner dates to catch up or just confessions we had, or simply just talk about stuff, laugh and sometimes  even cry  are gone.

Valerie was a compassionate person. However, I ask, how much compassion the defendant considered when he made the decision take valerie's life?  What gave him the right to do this to her ? what was going thru his mind if she was always very kind and generous to him ? when he lied about his mom and when he had no place to stay?

It is the request of the family that the maximum penalty for the crime for which the defendant was convicted be imposed. On behalf of the family and loved ones of Valerie Reyes we appreciate the opportunity of expression.


Kind regards

Leslie Martinez

# Statement 3

5/5/2020

Judge Vincent Briccetti

United States Attorney's Office

Southern District of New York

One St. Andrews Plaza

New York, NY 10007

Your Honor,

For those of you that have not had the pleasure of meeting Valerie will not truly understand how hard it's to express how the loss has affected and impacted my life. As it has with many others who had come to love and know her.

Valerie was truly a ray of light. She always so passionate about working, speaking about all that she wanted to do in life and she always had amazing love for her family and close friends.

I met Valerie when we worked as waitresses. We didn't talk a lot but I had a lot of respect for her. She had a strong work ethic and was very pleasant. We started to talk mostly towards the end of our time at the place we worked.

I later ran into her on July 4th where our story of friendship began.

Right away I could tell this young lady has some wisdom and was mature beyond her years when expressing her opinions and letting everyone know where she stood. Always holding very stimulating conversations she was truly a breath of fresh air.

She always looked at the bright side and was very inspirational to myself and others while being supporting. She was very down to earth; Valerie enjoyed the outdoors. She'd go to the parks, go bike riding and would love to be at the beach any moment she could. If she wasn't outside, she was with her family. Sundays were family day and she never missed a day. I had the honor once to be invited to spend time with her on a Sunday and that was something very important to Val.

Our friendship was between July 2013 to January 2017. Even though I was not personally in her life for the remainder of it. She had a place in my heart always. Her passing truly broke me and shook me to my core that the world will not be as bright as it once was with her in it.

We would speak openly to one another expressing our minds and how we felt on matters of different topics. These were times I wish I can go back to and once again sitting down at Duncan Donuts having a coffee and talking about everything. Time felt so short but so peaceful. Taking our walks in Glen Island Park, meeting at the New Rochelle Diner and running in the

freezing cold laughing. All these moments added up and gave me a bittersweet moment I can never get back now because of these unfortunate events.

The last time I saw Valerie happened to be when my family and I went to Barnes and Noble. I had no idea that was even where she worked because I had gone there for the 2 years of us not talking and never once had I saw her. I saw her working and was going to approach her but decided against it since I wasn't sure if she would appreciate being disturbed at work. I figured the next time I saw her I would say something. Sadly, that time could never happen because the next I heard about her was the post I saw of one of my friends sharing of her missing on Facebook. I sent the post around and spreading to keep an eye out to many people possible but the next I heard was on February 5th my little sister coming to tell me she sorry to bear bad news Valerie had been found and now is passed. I was so shocked and mad and in disbelieve. I attended everything her family held for her I felt so shaky and felt this couldn't be real or be reality.

Her passing has impacted me to feel so much remorse and guilt in this past year. That if I had reached out and talked to her maybe she would be ok or maybe she would have said she needed help. I feel so much anger how her life was taken so soon from the world, way before her time. All I can do is try to find some sort of peace but have so much regrets I feel robbed of an opportunity to reconnect with my friend Valerie.

People go on with life like nothing for me and all who love Val have to remember each day, each year that passes that she is not here. She no longer can laugh with her family or friends. Or making silly faces, or run around to give us all her words of wisdom.

This person who has taken my dear friend life for what? He has coldly murdered her and the pain of knowing that my friend cannot be here with her loved ones really upsets me. How she cannot be able to reach her goals and all she has said she wanted to do in her life. Valerie had expressed in our friendship how she wanted to be of service law enforcement, a nurse and finally her last decision that she did share how she wanted to follow her brother footsteps and become a tattoo artist. Her death has impact me so much so that I have returned to school to push myself to pass not just for me but for Val. Her life choices were taken for her in her short years that someone can just rip it away from her.

She no longer has the opportunity to live the life she wanted. She was easy to please and always in good spirt. He has taken the opportunity for her own family to see how her life would of turned out. Not only has he taken away an innocent life he has killed a bit of everyone soul who holds Valerie so dear to their hearts.

All I ask is justice. Justice for a life that shouldn't of been taken. A soul that was fierce but so gentle and loving.

Thank you for your time of consideration.

Victoria Summa